IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


EDWARD J. WHELAN,                          )
                                           )
                    Plaintiff,             )
                                           )
          vs.                              )     CA No. 01-1316
                                           )
TELEDYNE METALWORKING PRODUCTS and         )
ALLEGHENY TECHNOLOGIES, INC.,              )
                                           )
                    Defendants.            )


**MEMORANDUM ORDER**


     On October 29, 2004, Defendants Teledyne Metalworking

Products and Allegheny Technologies, Inc. (collectively,

"Defendants") filed a Motion for Reconsideration (Docket No.

107,"Mot. Recon.") of the decision of this Court on March 12,

2004, in which we denied cross-motions for summary judgment by

Defendants and by Plaintiff Edward J. Whelan.  Although the

motion for reconsideration was opposed by Mr. Whelan, the Court

granted Defendants' motion on December 16, 2004, and further

ordered that the original motions for summary judgment filed by

both parties would be reconsidered.  Based on the arguments of

the parties in support of and in opposition to the original

motions for summary judgment, as well as the arguments pertaining

to the motion for reconsideration, Plaintiff's motion for summary

judgment is denied and Defendants' motion is granted in part and

denied in part.

**I.    INTRODUCTION**

    A.    <u>Factual Background</u>[1]

       In 1965, Edward J. Whelan began working for a predecessor of Defendant Teledyne Metalworking Products ("TMP"), based near Pittsburgh, Pennsylvania.  In 1990, Plaintiff was diagnosed with Stargardt's disease, a progressively degenerative eye condition which leads to the loss of central vision.  Despite this restriction, he continued to work as an outside salesman for several years.  Like other TMP outside sales personnel, Plaintiff worked from his home.  By 1993, he had advanced to the position of sales engineer and was living in Woodstock, Connecticut.  However, at approximately the same time, his eye condition advanced to the point where he asked to be transferred back to the Pittsburgh area so he could have additional support from his family.  Although the transfer involved a change in division and a reduction in salary, TMP and Plaintiff were able to arrive at a mutually agreeable arrangement.  When he moved to Pittsburgh, he continued to work out of his home as an outside salesman for the TMP Carbide Products ("CP") Division.

    Mr. Whelan's vision continued to deteriorate and by 1996 he was no longer able to perform his assigned work.  He and the

---

    [1]  Unless otherwise noted, the facts in this section are undisputed.

company arrived at an arrangement whereby he would work, again out of his home, as a marketing coordinator for the CP Division. Mr. Whelan received a salary increase with this job change and TMP reimbursed him for a computer and special adaptive vision software.

Beginning in 1998, TMP decided to close its CP facilities in Brantford, Ontario, Hartford, Connecticut, and Huntsville, Alabama, as part of a corporate consolidation.  The manufacturing and administrative efforts at those locations were consolidated in Grant, Alabama, where the CP Division had previously been headquartered.  In early 1999, TMP decided that Mr. Whelan's position as marketing coordinator would also be transferred to Grant.

On March 25, 1999, Greg Humphries, Vice President and General Manager of Teledyne Firth Sterling,[2] wrote to Mr. Whelan via electronic mail.  In relevant part, the letter stated:

> . . . I wanted to recap our conversation of March 25, 1999. . . . Your position will also need to be located at Grant, Alabama, in order for us to gain the needed administrative efficiencies.  Additionally, this move will allow for more interactions with product management, sales, and the manufacturing teams so we can create a better marketing strategy.

---

[2]  Mr. Whelan originally worked for a company called Firth Sterling.  In approximately 1967, Firth Sterling was acquired by Teledyne and became known as Teledyne Firth Sterling.  In the early 1990s, Teledyne and Allegheny Ludlum merged to form Allegheny Technologies, Inc.  At some point, the name of Teledyne Firth Sterling was changed to Teledyne Metalworking Products.  (Defendants' Motion for Summary Judgment, Exh.1, Deposition of Edward J. Whelan, at 10-12, 22-26.)

> Ed, I would like to offer you this opportunity to
> relocate to Grant.  Having recently relocated myself, I
> know this is never an easy decision. . . .
>
> I have asked Human Resources to send you a copy of the
> Relocation Policy to help you in your transition to
> Grant.
>
> I am sure you can appreciate the need for planning, so
> please let me know by April 30, 1999 of your decision.

Defendants' Motion for Summary Judgment, Docket No. 37, "Defs.'
Mot. Sum. Judg.," Exh. 3.)

On April 27, 1999, Mr. Whelan's attorney, Natalie Ruschell,
wrote to Mr. Humphries, stating that for medical and family
reasons, Mr. Whelan was unwilling to relocate to Alabama.  She
asked that he be allowed to continue to perform the job of
marketing coordinator by working from his home in Pittsburgh as
he had for at least four years.  (Defs.' Mot. Sum. Judg., Exh.
4.)  The same letter asked Mr. Humphries or his legal counsel to
"engage in communication that is both meaningful and productive
to allow Mr. Whelan the opportunity to continue his employment
with your company while simultaneously accommodating Mr. Whelan
and his circumstances."  (Id.)

This began a lengthy exchange of letters between Ms.
Ruschell and Stephen Spolar, an in-house attorney for Allegheny
Technologies, Inc.[3] ("ATI.")  On March 31, 2000, Lauren

---

[3]  TMP is an unincorporated division of TDY Industries which, in
turn, is an indirect subsidiary corporation of ATI.  (Defendants'
Brief in Support of Motion for Reconsideration, Docket No. 108, at 2
and Exh. 3.)  Plaintiff does not dispute this description of the
corporate relationship between Defendants TMP and ATI.

McAndrews, an ATI in-house attorney who had replaced Mr. Spolar, wrote to Ms. Ruschell:

> Mr. Whelan was informed a year ago that his position would be located in Grant, Alabama, with the other administrative functions of Firth Sterling, and he was given the opportunity to relocate to Grant. We would like a response by April 14, 2000, from Mr. Whelan as to his willingness to relocate to Grant, and if so, whether he will be able to perform the duties of Marketing Coordinator with or without accommodation. If I do not hear from you or Mr. Whelan prior to close of business on April 14, Mr. Whelan's employment will be terminated.

(Defs.' Mot. Sum. Judg., Exh. 12.)

Ms. Ruschell responded on April 14, 2000, with another letter reiterating her client's position on the relocation and accommodation issues, to which Ms. McAndrews replied on May 4, 2000:

> We have attempted to work with you and Mr. Whelan to identify an appropriate accommodation. The accommodation you and he have suggested (creation of a new position for him in Pittsburgh) is not required by law. It is our interpretation of your [April 14, 2000] letter that Mr. Whelan is not willing to relocate to Grant, AL, and that he has voluntarily terminated his employment with Metalworking Products effective April 14, 2000.

(Defs.' Mot. Sum. Judg., Exh. 14.)

B.   Procedural Background

On December 14, 2000, Mr. Whelan filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"), asking that it be cross-filed with the Pennsylvania Human Relations Commission. (Defs.' Mot. Sum.

Judg., Exh. 16.)  Mr. Whelan claimed that TMP had discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § § 12101 *et seq.* ("ADA") and of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 955.  Mr. Whelan subsequently filed suit in this Court on July 16, 2001.

Mr. Whelan's Complaint stated three causes of action in violation of the ADA: failure to provide a reasonable accommodation; wrongful termination; and failure to participate in good faith in the ADA "interactive process."  He also claimed he was entitled to punitive damages for each of the three proceeding claims because of Defendants' alleged malice in these violations, and that the same actions violated the PHRA.

On September 17, 2001, Defendants filed a Motion to Dismiss (Docket No. 2), based on four arguments.  First, Defendants argued that Mr. Whelan's charge of discrimination was not filed with the EEOC before the 300-day statute of limitations had run.  Second, the three claims for punitive damages (Counts II, IV, and VI of the Complaint) were not independent causes of action and therefore should be dismissed.  In addition, Count V, claiming Defendants had failed to participate in the interactive process, was redundant with the failure-to-accommodate claim and should be dismissed as a separate cause of action.  Finally, they argued that ATI was not Plaintiff's "employer" as that term is understood under the ADA and PHRA, and therefore it should be

dismissed as a Defendant.

We denied Defendants' Motion to Dismiss, without prejudice to their right to renew the same arguments in a motion for summary judgment. (Order of Court, April 19, 2002, Docket No. 10.) Following more than a year of discovery, Plaintiff filed a Motion for Summary Judgment (Docket No. 34) on October 10, 2003, as did Defendants (Docket No. 37.) The Court held oral argument on March 12, 2004, and, as noted above, denied both motions, stating briefly that because material issues of fact existed which should be tried to a jury, neither party was entitled to judgment in its favor as a matter of law. (Order of Court, March 12, 2004, Docket No. 49.)

Eight months later, Defendants filed a Motion for Reconsideration. In that motion, Defendants claimed that contrary to the original decision entered with regard to their motion for summary judgment, there was no material dispute on the following points:

    (1)  ATI was not Whelan's employer and should be dismissed from the case;

    (2)  TMP engaged in good faith in the interactive process, thus Count V should be dismissed; and

    (3)  to the extent Plaintiff attempted to pursue a disparate treatment claim, that claim was disavowed by Mr. Whelan's counsel in oral argument on March 12, 2004, and should be dismissed.

(Defs.' Mot. Recon., ¶¶ 2-5.)

7

The Court decided that in fairness to both parties and in order to streamline the issues to be presented at trial, we should explain in detail the rationale for our conclusion in March 2004 that there were issues which could not be resolved without inappropriate fact-finding by the Court.  We also recognized that we had not ruled on three issues which could be decided as a matter of law, specifically, whether ATI was Mr. Whelan's employer for purposes of this litigation, whether Plaintiff's charge of discrimination was timely filed with the EEOC and PHRC, and whether Mr. Whelan had stated and maintained a claim of disparate treatment.

C.   <u>Jurisdiction and Venue</u>

Jurisdiction is based on Mr. Whelan's ADA claims pursuant to 28 U.S.C. § 1331 and the PHRA claims pursuant to the supplemental jurisdiction provided by 28 U.S.C. § 1367(a).  Venue is appropriate in this Court inasmuch as the events giving rise to the claims occurred within this judicial district.  28 U.S.C. § 1391(b).

## II.  STANDARD FOR SUMMARY JUDGMENT

A court may grant summary judgment if the party so moving can show, based on "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,  . . . that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c)); <u>Rossetti v.</u> <u>Busch Entertainment Corp.</u>, 87 F. Supp.2d 415 (E.D. Pa. 2000). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law, the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. <u>Anderson v. Liberty</u> <u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. <u>Rossetti</u>, <u>id.</u>, *citing* <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and <u>Big Apple BMW, Inc. v. BMW of North America,</u> <u>Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). In short, the movant must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the opposing party could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in favor of the movant. <u>Celotex Corp. v.</u> <u>Catrett</u>, 477 U.S. 317, 318 (1986).

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the

existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." <u>Celotex</u>, <u>id.</u> at 322-23; <u>Rossetti</u>, <u>id.</u>; Fed.R.Civ.P. 56(e).  The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs.  <u>Liberty Lobby</u>, 477 U.S. at 250-252; <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 633 (3d Cir. 1995).

**III.  ANALYSIS**

    A.   <u>Relevant Law and a Summary of Plaintiff's Claims</u>

       1.  *The Americans with Disabilities Act:*  The ADA was designed to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The basic premise of the ADA is that "no covered entity shall discriminate against a qualified individual with a disability because of the disability. . . in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  For purposes of summary judgment, the parties do not dispute that Mr. Whelan was a

"qualified individual with a disability"[4] as that phrase is understood in ADA litigation or that Defendants are "employers" as defined in 42 U.S.C. § 12111(5)(A).

Three provisions of the ADA are relevant to this case. First, the ADA provides that an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A). As applied to the facts herein, the term "reasonable accommodation" could include modifying facilities to make them readily accessible to and usable by individuals with disabilities, modifying the employee's working conditions such as job restructuring or reassignment, or acquiring specialized equipment or devices. 42 U.S.C. § 12111(9). As ADA case law has evolved, it is clear that the forms of reasonable accommodation suggested

---

[4] A "qualified individual with a disability" is defined in the ADA as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To establish that a plaintiff is "qualified" under the ADA, the employee must show that he "satisfies the requisite skill, experience, education and other job-related requirements of the . . . position." Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001) (internal quotation omitted). The ADA defines "disability" as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

in the statute itself merely provide a starting point for an
expansive range of actions which may be devised to accommodate
disabled employees.

Mr. Whelan claims in Count I of his Complaint that TMP and
ATI failed to provide him with a reasonable accommodation in
connection with the transfer to Alabama.  Specifically, he
alleges that he proposed a reasonable accommodation, i.e., to
continue working out of his home as he had done for the previous
four years, and that this accommodation would not have caused his
employer undue hardship.  By failing to make this or any other
accommodation in connection with the proposed transfer, Mr.
Whelan contends that Defendants violated the ADA.  (Complaint, ¶¶
21-32.)[5]

Second, an employer violates the ADA when an employee who is
a qualified individual with a disability suffers an adverse
employment action as a result of that disability.  Williams v.
Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir.
2004), citing Taylor v. Phoenixville School Dist., 184 F.3d 296,
306 (3d Cir. 1999), and Gaul v. Lucent Technologies, 134 F.3d

---

[5]  We shall ignore Plaintiff's additional incomprehensible
allegation that the employer's "proposed accommodation, that Plaintiff
be transferred to rural Grant, Alabama, was not a reasonable
accommodation due to the limitation of vision services available and
accessible to the Plaintiff to accommodate his vision impairment in
Grant, Alabama."  (Complaint, ¶ 34.)  The decision to transfer Mr.
Whelan to Alabama could in no way be considered a "proposed
accommodation" that would help Plaintiff perform the job of marketing
coordinator despite his blindness.

576, 580 (3d Cir. 1998).  As in other types of cases alleging discriminatory discharge, the plaintiff must establish that he was terminated "because of" the disability.  <u>Williams</u>, 380 F.3d at 774, *quoting* 42 U.S.C. § 12112(a).

In Count III of his Complaint, Mr. Whelan alleges that Defendants violated the ADA by refusing to provide accommodations which would facilitate his transfer to Alabama and then fired him for failing to accept the transfer.  He argues that this firing "was done on the basis of Plaintiff's disability."  (Complaint, ¶¶ 40-41.)

Finally, the ADA implementing regulations[6] require the employer and employee to undertake "an informal, interactive process . . . [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3). In general, an employee's request for an accommodation triggers this interactive process in which "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."  <u>Mengine v. Runyon</u>, 114 F.3d 415, 420 (3d

---

[6]  As directed in 42 U.S.C. § 12116, the EEOC has promulgated regulations for implementing federal anti-discrimination statutes, including the ADA.  *See* 29 C.F.R. §§ 1630 *et seq.*  These regulations are not binding on courts, but are entitled to deference where they are consistent with the statute itself.  <u>Deane v. Pocono Medical Ctr.</u>, 142 F.3d 138, 143 n.4 (3d Cir. 1998) (*en banc*) (EEOC regulations are entitled to "substantial deference.")

Cir. 1997).[7]  "A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."  Taylor, 184 F.3d at 312, *quoting* Bultemeyer v. Ft. Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996).

Count V of Mr. Whelan's Complaint alleges that although he "engaged in and attempted to engage in good faith communications and negotiations to come to a reasonable accommodation" (Complaint, ¶ 46), "Defendants failed to engage in the interactive process by failing to respond in a timely manner to the Plaintiff and his attorney's communications, obstructing the interactive process, and delaying the interactive process." (Id., ¶ 48.)

2.  *The Pennsylvania Human Relations Act:*  The PHRA also addresses disability discrimination.  *See* 43 Pa. C.S. § 955(a), stating in relevant part, "it shall be an unlawful discriminatory practice . . . for any employer because of the . . . non-job related handicap or disability . . . of any individual . . . to discharge from employment . . . or to otherwise discriminate against such individual."  Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts."  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.

---

[7]  Although Mengine was concerned with the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, that statute and the ADA define "reasonable accommodation" identically.  Mengine, 114 F.3d at 420.

1996).  However, we need not dwell on this point because, as discussed below, Mr. Whelan's PHRA claim was untimely.

    B.   <u>Threshold Issues</u>

       As noted above, resolving three issues as a matter of law will allow the case to proceed more quickly at trial.

       1.  *Timeliness of Plaintiff's EEOC Claim:*[8]   In their Brief in Support of the Motion for Summary Judgment,[9] Defendants argue that all of Mr. Whelan's claims should be dismissed because he failed to file a timely claim of discrimination with the EEOC. (Docket No. 38, "Defs.' Sum. Judg. Brief," at 41-46.)  In short, they claim that although Mr. Whelan may have submitted a document entitled "General Information" to the EEOC on October 10, 2000, this document did not satisfy the requirement that a claimant file a verified complaint with the EEOC within 300 days of the date when he became – or should have become –  aware that he had been discriminated against because of his disability.  Mr. Whelan did not sign and verify the official "Charge of Discrimination"

_____

    [8]  The Court is not persuaded by Plaintiff's argument that Defendants irrevocably conceded this point early on.  The statement to which Mr. Whelan refers in his brief opposing the motion for summary judgment (Docket No. 41, at 10) was made in the context of deciding the motion to dismiss, where Defendants acknowledged that, given the liberal standards at that point in the litigation, Mr. Whelan may be deemed to have filed his EEOC charge on October 10, 2000.  (*See* Defendants' Reply Brief, Docket No. 7, at 2, n.1.)  We will not interpret that statement as a total concession of the fact, especially since <u>Edelman</u> had not yet been decided when the reply brief was filed.

    [9]  This issue is not raised in Defendants' Brief in Support of the Motion for Reconsideration.

until December 14, 2000.

As is well-established, in order to bring suit under the ADA, a plaintiff is normally required to file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice took place.  However, Pennsylvania is a "deferral state," that is, a state which has its own laws prohibiting discriminatory employment practices and authorizing a state agency, namely, the Pennsylvania Human Relations Commission, to pursue such claims.  In deferral states, a plaintiff has 300, not 180, days from the date of the alleged unlawful employment practice in which to file a charge with the EEOC, even if he never files with the state agency.  42 U.S.C. § 2000e-5(e)(1); Seredinski v. Clifton Precision Prods. Co., 776 F.2d 56, 61 (3d Cir. 1985); Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1414-15 (3d Cir. 1991).

Citing Plaintiff's General Information document, Defendants argue that Plaintiff knew when he received the March 25, 1999 e-mail from Mr. Humphries that he would face termination if he did not relocate to Alabama.  Therefore, whether made on October 10, 2000, or December 14, 2000, the claim of discrimination was untimely.  (Defs.' Sum. Judg. Brief at 42 and Exh. 17 at unnumbered page 5.)  They argue that this case is "very similar" to Watson v. Eastman Kodak Co., 235 F.3d 851 (3d Cir. 2000). In Watson, the plaintiff was advised on February 4, 1997, that he

16

was being removed from his position as an account executive due
to poor performance.  In the same letter, he was told he would be
allowed to remain at Kodak only until March 7, 1997, unless he
found another position with the company.  When he was unable to
do so, Kodak terminated his employment on that date.  Because
Watson did not submit an EEOC charge until 330 days after he
received the termination letter, the district court granted
Kodak's summary judgment motion based on the plaintiff's failure
to timely exhaust his administrative remedies.  Watson, 235 F.3d
at 853-854.

The Court of Appeals affirmed, beginning its analysis by
stating that "the crucial issue in this case is whether the
actionable adverse employment decision was the one to separate
Watson from the position of Account Executive or the one to
terminate his employment with Kodak entirely."  Watson, 235 F.3d
at 854.  Applying the Supreme Court's holding in Delaware State
College v. Ricks, 449 U.S. 250 (1980), the Court upheld the lower
court's decision that the plaintiff's unlawful termination claim
accrued on February 4, 1997, the date he received the letter from
his supervisor.  Citing Ricks, the Court of Appeals noted that
"the key inquiry was identifying the precise alleged unlawful
employment practice," and the date on which it occurred.  As
pointed out in Ricks, the Third Circuit held that "the proper
focus is upon the time of the discriminatory acts, not upon the

time at which the consequences of the acts became most painful."
Watson, id. at 855 (internal quotations and citations omitted.)

We find Watson distinguishable from this case on its facts.
Here, Plaintiff received a letter from his supervisor on March
25, 1999, offering "the opportunity to relocate" and asking for
his decision by April 30, 1999.  (Defs.' Sum. Judg. Mot., Exh.
3.)  Contrary to Defendants' assertion, nothing in that letter
advised Mr. Whelan that if he did not accept the transfer, he
would be terminated.  As Plaintiff states, "the injury here was
not a proposed transfer, but a proposed transfer which did not
include reasonable accommodation."  (Plaintiff's Brief in
Opposition to Defendants' Motion for Summary Judgment, Docket No.
41, "Plf.'s Opp. to Sum. Judg.," at 10.)  The question of
reasonable accommodation was not addressed in the March 25, 1999
e-mail.  Nor did anyone from TMP respond to Ms. Ruschell's letter
of April 27, 1999, in which she explicitly stated, "Mr. Whelan is
unable to accept your proposal," by telling her or Mr. Whelan
that if he were unwilling to transfer, he would be terminated.
Instead, the parties corresponded for a year as if they were
mutually attempting to work out the accommodation problem.  In
sum, unlike the unequivocal letter terminating the plaintiff's
employment in Watson, the March 31, 1999 e-mail did not even
imply that Mr. Whelan's employment would be terminated if he did
not relocate.

In addition, Mr. Whelan does not complain only of the decision to terminate his employment, he also claims that Defendants failed to accommodate his disability and failed to participate in the interactive process in good faith.  Even as late as December 27, 1999, Mr. Spolar provided a copy of the marketing coordinator job description and asked Mr. Whelan to advise him of his ability to "satisfactorily perform such duties, with or without accommodation, and what your collective thoughts are on any accommodation, if needed."  (Defs.' Mot. Sum. Judg., Exh. 10.)  Moreover, even though this letter states that "TMP still believes that Ed's relocation is necessary to perform this function," a reasonable person could conclude that the relocation question remained unresolved, given that Mr. Spolar also wrote that he was providing medical facility information "in order to facilitate the move and alleviate Ed's worries *if he chooses to relocate.*"  (Id., emphasis added.)

Defendants alternatively argue that the 300-day period began to run on April 27, 1999, when Ms. Ruschell proposed that Mr. Whelan be allowed to remain in Pittsburgh because he should have known that this accommodation might be denied.  (Defs.' Sum. Judg. Brief at 45.)  The April 27, 1999 letter merely opened the interactive process; Defendants did not unequivocally reject the requested accommodation until March 31, 2000.  It would seem patently unfair and contrary to the policy goals of the ADA for

19

an employer to go through the motions of the interactive process, then argue that the employee's claim was time-barred because he "should have known" that the parties would not arrive at a mutually agreeable solution within 300 days of his request for a reasonable accommodation.[10]

Left to its own analysis, the Court would have concluded that the filing period began on March 31, 2000, when Mr. Whelan was given an ultimatum that his employment would be terminated if he did not advise TMP by April 14, 2000, if he were willing to relocate and whether he would be able to perform the duties of marketing coordinator, without or without accommodation.[11]

---

[10] Nor does the Court find persuasive the case law cited by Defendants for this proposition.  The plaintiff in <u>Soignier v. American Bd. of Plastic Surgery</u>, 92 F.3d 547 (7th Cir. 1996), unequivocally knew when he took the Board's oral exam in November 1992 that it had not provided the accommodations he had requested; thus, it was clearly unreasonable for him to argue that the period in which to file a timely complaint did not begin until two years later when the Board refused to reconsider its decision not to allow him to take the exam again.  Here, Defendants and Plaintiff exchanged letters for a year before Mr. Whelan was plainly told that he would not receive the accommodation he requested.  Similarly, in <u>Brobston v. United States Gypsum Co.</u>, CA No. 96 C 0087, 1999 U.S. Dist. LEXIS 4596 (N.D. Ill. Mar. 31, 1999), two specific and permanent events – being placed on a layoff status which denied Brobston the right to be considered for job vacancies with the employer, and being denied employee benefits after he signed a form ending his participation in the employer's investment plan – should have prompted Brobston to protect his rights.  Here, there is no evidence of any triggering event between March 25, 1999, and March 31, 2000, which should have caused Mr. Whelan to absolutely understand that not only was his preferred accommodation denied, but that no other offers of accommodation would be forthcoming.

[11] This conclusion is based on a summary of the law provided by the Court of Appeals in <u>Bailey v. United Airlines</u>, 279 F.3d 194, 199 (3d Cir. 2002), i.e., "the charge-filing period begins to run on a claim of unlawful discrimination when the employer establishes its official position and communicates that position by giving notice to

(Defs.' Sum. Judg. Mot., Exh. 12.)  However, Plaintiff concedes that the December 27, 1999 letter from Mr. Spolar alerted him and his attorney to the fact that no accommodations would be offered to him in connection with the transfer to Alabama, thus starting the limitations period for his claims that Defendants failed to offer a reasonable accommodation and failed to participate in the interactive process.  (Plf.'s Opp. to Sum. Judg. at 8-9.)  He also argues that the clock began to run on his termination claim as of April 14, 2000, a clearly untenable position in light of the holding of <u>Ricks</u>, given the content of Ms. McAndrews' March 31, 1999 letter.  If we agree that the December 27, 1999 letter was the earliest triggering event, Plaintiff's filing on December 14, 2000, was untimely except for his termination claim.  Mr. Whelan argues, however, that the General Information statement filed on October 14, 2000, satisfied the EEOC requirements.  A recent Supreme Court decision, <u>Edelman v. Lynchburg College</u>, 535 U.S. 106 (2002), supports his position.[12]

Leonard Edelman, a professor at Lynchburg College, faxed a

the affected employee. An employer establishes its official position when it decides, unconditionally, to terminate an individual's employment and provides the employee with notice of the unconditional decision to terminate his or her employment. . . . *The charge-filing period begins to run only when the employee receives unequivocal notice of the adverse employment decision.*"  (Internal citations and quotations omitted, emphasis added.)

[12]  The Court finds it curious that although <u>Edelman</u> was established law for more than a year before the parties filed their motions for summary judgment, neither party refers to a Supreme Court case which appears to definitively resolve the timeliness issue here.

letter to an EEOC field office, complaining of employment discrimination.  Although the fax was submitted before the end of the 300-day limitations period, Edelman did not provide a verified charge until after the period had expired.  The district court held that the unverified letter was not a "charge" according to EEOC regulations, dismissed the case, and was affirmed by the Court of Appeals for the Fourth Circuit.  The Supreme Court reversed, finding that an oath or affirmation of a charge is only required "by the time the employer is obliged to respond to the charge, not at the time an employee files it with the EEOC."  <u>Edelman</u>, 535 U.S. at 113.

The focus of the <u>Edelman</u> decision was to align the requirement that a charge "be in writing under oath or affirmation" (42 U.S.C. § 2000e-5(b)), with the requirement that it be filed within 300 days of the alleged unlawful employment practice (42 U.S.C. § 2000e-5(e)(1)).  Justice Souter, writing for seven members of the Court, explained that the purpose of the timing requirement "is to encourage a potential charging party to raise a discrimination claim before it gets stale, for the sake of a reliable result and a speedy end to any illegal practice that proves out," while the verification requirement "has the different object of protecting employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability

for perjury." Edelman, 535 U.S. at 112-113.  The verification provision is meant to protect employers against the "catchpenny claims of disgruntled but not necessarily aggrieved employees" in that the employer need not respond to the charge when it is initially filed it with the EEOC, but only after it is verified. Id. at 115.  A refusal to allow the verification provision to relate back to the original filing would also be inconsistent with "a long history" of allowing relation-back of a subsequent verification of an unverified filing when a statute requires that it be made under oath.  Id. at 116.

The decision in Edelman reinforces, albeit for different reasoning, the long-held position of the Third Circuit.  In Michelson v. Exxon Research & Engineering Co., 808 F.2d 1005, 1010 (3d Cir. 1987), the Court of Appeals, while concluding that "the mere existence of a writing" is not sufficient to constitute an EEOC charge of discrimination, held that where the notice to the EEOC is "of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery" the notice may be deemed timely.  The writing must provide sufficient detail "to allow the EEOC to investigate immediately [instead of] await further communication from the plaintiff before investigation." Michelson, id. (internal citations and quotations omitted); see also, Benn v. First Judicial Dist., CA No. 98-5730, 2000 U.S. Dist. LEXIS 6659, *9

(E.D. Pa. Apr. 26, 2000), applying <u>Michelson</u> and noting that EEOC implementing regulation 29 C.F.R. § 1601.12(b) provides that a "charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."

The parties disagree as to whether the October 10, 2000, filing was "verified," i.e., whether it was sworn under oath subject to perjury.  Applying <u>Edelman</u>'s holding regarding relation-back of a verification and <u>Michelson</u>'s description of the information necessary in the preliminary filing, we conclude that the General Information document provides sufficient information to allow the EEOC to proceed with an investigation, and that even if it were not verified on October 10, the verification made under oath on December 12, 2000, is sufficient to satisfy the 300-day filing period requirement.

Defendants' Motion for Summary Judgment, based on the alleged untimeliness of Plaintiff's EEOC filing, is therefore denied.

However, as Defendants point out, even the EEOC filing on October 10, 2000, does not save Mr. Whelan's claims under the PHRA.  (Defs.' Sum. Judg. Brief at 46, n.8.)  For those claims to be timely, he had to have filed a complaint with the PHRC within 180 days of the date of the alleged act of discrimination, that

is, not later than September 29, 2000.  43 Pa. C.S. § 959(h);

Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997),

*cert. denied*, 522 U.S. 914 (1997)("Pennsylvania courts have

strictly interpreted" this filing requirement.) There is no

evidence that any documentation was filed with the PHRC prior to

the request in Mr. Whelan's December 14, 2000 EEOC charge of

discrimination that it should be cross-filed with the state

agency.  "Filing of an administrative claim within the 300-day

EEOC deadline but beyond the 180-day PHRA deadline does not

preserve a PHRA claim."  Braithwaite v. Accupac, Inc., CA No.

00-5405, 2002 U.S. Dist. LEXIS 25044, *12 (E.D. Pa. Dec. 12,

2002), *citing* Sharp v. BW/IP Int'l, Inc., 991 F.Supp. 451, 457

(E.D. Pa. 1998).

In his Brief in Opposition to the Motion for Summary

Judgment, Plaintiff offers no argument to refute Defendants'

position.  Plaintiff's claims under the PHRA in Count VII are

therefore dismissed for failure to timely exhaust his

administrative remedies.

2.  *Whether ATI was Mr. Whelan's "Employer" as that*

*Term is Understood under the ADA:*  Defendants argue that the

evidence is undisputed that Mr. Whelan was employed by TMP, not

by ATI, at the time of the events giving rise to this litigation.

(Defendants' Brief in Support of Motion for Reconsideration,

Docket No. 108, "Defs.' Recon. Brief," at 1-9.)  They base this

25

argument on such evidence as:

> Mr. Whelan's acknowledgment at his deposition that TMP not ATI was his employer;
>
> the indirect and extended corporate relationship between the two entities;
>
> the fact that the individuals responsible for transferring Mr. Whelan's position to Alabama, analyzing his request to remain in Pittsburgh, and making day-to-day determinations about his job status, salary, and pension were all employees of TMP; and
>
> the fact that Mr. Whelan was subject to TMP polices and procedures, not those of ATI.

(Defs.' Recon. Brief at 2-4.)

Defendants argue the only fact tying ATI to this case, apart from the fact that it is ultimately TMP's parent corporation, is that TMP utilized ATI's legal department to correspond with Mr. Whelan's attorney.  (Defs.' Recon. Brief at 4.)

To refute this contention, Plaintiff offers a single argument, based on the question "did the parent company effectuate the Plaintiff's discharge," understandably concluding that it did.[13]  As evidence, he points to the fact that every piece of correspondence between his attorney and Defendants, including his termination letter, was on ATI letterhead.

---

[13]  The Court notes that this statement of the issue is derived from Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985), in which the court concluded that the parent-company "dominated" its subsidiary and "effectuated [the plaintiffs'] discharges" when it was shown that they were terminated as the result of personnel actions ordered by the CEO and the Board of the parent-company.  There is no evidence of comparable actions by ATI herein.

(Plaintiff's Brief in Opposition to Defendants' Motion for
Reconsideration, Docket No. 124, "Plf.'s Opp. to Mot. Recon.," at
3.)   Plaintiff contends that, contrary to Defendants' position,
public policy concerns, specifically the remedial public policy
underlying anti-discrimination laws, weigh in favor of the
broadest possible definition of "employer."[14]   (Id. at 4.)
Moreover, he claims that his pension benefits come from the
Allegheny Technologies Master Pension Trust and are administered
by the Allegheny Technologies, Inc. Benefits Center.   (Id.)

As Plaintiff acknowledges, the controlling case in this
Circuit on the question of which of two or more entities was the
plaintiff's employer for purposes of assigning liability under
anti-discrimination statutes has long been Marzano v. Computer

---

[14]   The case on which Plaintiff relies for this proposition, Lusk
v. Foxmeyer Health Corp., 129 F.3d 773 (5th Cir. 1997), ultimately
concluded that the district court had not erred in granting summary
judgment to the defendant because the scant evidence of common
management and ownership did not permit an inference that the parent
was responsible for the decision to terminate employees of the
subsidiary.  Moreover, the complete text of the quotation on which
Plaintiff relies at page 4 of his brief opposing the motion for
reconsideration states: "Courts adopting a broad definition of the
term 'employer' have done so based on the significant remedial public
policy underlying the anti-discrimination laws.  While we support this
reasoning, we also are mindful that the doctrine of limited liability
was originally formulated to implement both economic and democratic
goals and that approaches to piercing the corporate veil which fail to
recognize these important public policy considerations underlying the
doctrine are deficient.  Accordingly, *before piercing the corporate
veil in the employment discrimination context, we and other courts
have focused on the core activities regulated by the anti-
discrimination laws and, therefore, on whether the parent corporation
was so involved in the daily employment decisions of the subsidiary as
to justify treating the two corporations as a single employer.*"  Lusk,
129 F.3d at 777, n.3 (internal quotations and citations omitted,
emphasis added.)

Science Corp., Inc., 91 F.3d 497 (3d Cir. 1996).  The plaintiff
in Marzano argued that she was initially hired by the parent
corporation, CSC; that she "continued to believe" she was a CSC
employee despite a merger between CSC and her direct employer,
CSC Partners; that after the merger, she continued to receive
paychecks bearing the name of CSC and to belong to the CSC
pension plan; that the relevant CSC Partners' leave policy was
based on information provided by CSC; and that she "continued to
have regular involvement with CSC corporate as part of her job
responsibilities."  Marzano, 91 F.3d at 514.  Despite all this
evidence, the Court concluded:

> Even if we accept all of Ms. Marzano's statements as
> true, we conclude that these facts, taken together, do
> not demonstrate that CSC and CSC Partners were "so
> interrelated and integrated in their activities, labor
> relations and management" that we should pierce the
> corporate veil.  Her only direct involvement with CSC
> at the time of her layoff was her participation in
> CSC's pension plan. In addition, she offers no evidence
> that CSC was in any way, shape or form involved in CSC
> Partners' management or personnel decisions. For this
> reason, we conclude that the charges against CSC should
> be dismissed.

Marzano, 91 F.3d at 514 (remanding the case to the District Court
with instructions to dismiss all claims against CSC.)

While the Marzano holding was expressed in terms of piercing
the corporate veil to determine if the two entities were so
interrelated that they should both be held liable as the
plaintiff's employer, the Third Circuit has recently revisited
this issue and established a three-part test for answering this

28

question.  In <u>Nesbit v. Gears Unlimited, Inc.</u>, 347 F.3d 72, 85

(3d Cir. 2003), *cert. denied*, 541 U.S. 959 (2004), the Court

adopted a framework explicitly "tailored to Title VII's policy

goals."  Briefly stated, this test requires a court "to consider

a company and its affiliates a single employer under Title VII[15]

(1) when a company has split itself into entities with less than

fifteen employees intending to evade Title VII's reach or (2)

when a parent company has directed the subsidiary's

discriminatory act of which the plaintiff is complaining" or (3)

when the "entities' affairs are so interconnected that they

collectively caused the alleged discriminatory practice."

<u>Nesbit</u>, 347 F.3d at 85-86.

Since there is no evidence that ATI and TMP split themselves

into two entities to avoid liability under federal discrimination

laws, we need not dwell on the first test.  As to the second

test, the Court reasoned that by directing a subsidiary to

perform the allegedly discriminatory act, the parent has

forfeited its right to be treated as a separate entity and has,

in actuality, committed the act itself, thereby opening itself to

liability.  <u>Nesbit</u>, 347 F.3d at 86.  Plaintiff identifies only

---

[15] "In the context of employment discrimination, the ADA . . . [and] Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*] . . . serve the same purpose--to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the [other] as well."  <u>Newman v. GHS Osteopathic, Inc.</u>, 60 F.3d 153, 157 (3d Cir. 1995).

two ATI employees, both associated with ATI's legal department, as having had any involvement in his termination.  None of his evidence, however, implies that either Mr. Spolar or Ms. McAndrews did any more than provide legal advice to TMP managers and write letters to his attorney on their behalf.  Thus, the second test fails to show that anyone at ATI "directed" TMP's actions with regard to Mr. Whelan and therefore should be held liable for those actions.

With regard to "substantive consolidation," the third test, the Court acknowledged that it is difficult to achieve.  <u>Nesbit</u>, 347 F.3d at 86.  While one significant issue is "financial entanglement," in the context of an employment discrimination case,

> the focus . . . rests on the degree of operational entanglement – whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other.

<u>Nesbit</u>, 347 F.3d at 87.

In applying the third test to the facts of Nesbit's claim of gender discrimination, the Court concluded that although the principal of one entity fired the plaintiff who worked for the

other, this fact alone did not mean that they were substantively consolidated.  Id. at 88.  Nor was such consolidation achieved by the fact that the two companies coordinated their hiring practices and jointly advertised for positions.  However, with regard to employment functions, the Court stated the following caveat:  "Our outcome might be different if Gear [plaintiff's employer] had no say in hiring its own employees, if Gear and Winters [the associated company] held themselves out to job applicants as a single company, if the two companies' human resources functions were entirely integrated, and/or if they did not maintain separate payrolls and finances."  Id. at 89.

The only integrated functions apparent from Plaintiff's evidence are the consolidated legal department and the fact that his pension benefits allegedly come from and are administered by the parent's benefit center.  A closer review of his evidence on the latter point, however, shows that the name of the plan explicitly refers to "Teledyne Retirement Plan for Teledyne Advanced Materials Employees" and that it is administered by an independent bank.  (See Defs.' Recon. Brief, Exhs. 13 and 14.)

As the Court stated in Nesbit, without "more significant operational entanglement, common ownership and de minimis coordination" are insufficient reasons on which to assign liability.  Nesbit, 347 F.3d at 89.  Likewise, I conclude that for purposes of determining which entity was responsible for the

allegedly discriminatory treatment of Mr. Whelan, ATI and TMP are separate corporations and there is no evidence to support the conclusion that ATI should be held liable in this case.

Defendants' motion for summary judgment is therefore granted insofar as the motion seeks to dismiss Allegheny Teledyne, Inc. as a defendant in this case.

3. *Disparate Treatment Claim:* In their Brief in Support of the Motion for Reconsideration, Defendants note, almost as a postscript, that to the extent Mr. Whelan's Complaint could be construed to make out a claim of disparate treatment under the ADA, that claim was explicitly disavowed by Plaintiff's counsel at the March 12, 2004 hearing. In response to a question by the Court, counsel stated, "I have not claimed that he was treated differently than [sic] other employees. . . . I'm not claiming disparate treatment. That's a different cause of action and legal theory. . . . I have claims, none of them are disparate treatment. . . . That's not what this case is about and I don't have to establish disparate treatment to establish disability discrimination." (Defs.' Recon. Brief at 23; *see also,* Transcript of March 12, 2004 Hearing, Docket No. 50, at 33-35.)

In his brief opposing Defendants' motion, Plaintiff's counsel reversed himself on these statements, claiming that "Plaintiff's unlawful discharge cause of action is a disparate treatment claim," and that he "at no time . . . and in no way

whatsoever 'disavowed' . . . any disparate treatment claim.  All three cause of action plead [sic] in Plaintiff's Complaint .. were set forth clear [sic] and unambiguously."  (Plf.'s Opp. to Mot. Recon. at 11-12.)

Defendants further assert that Plaintiff failed to establish a disparate treatment claim because "he has not offered one iota of evidence [that] others without disability were not terminated when asked to transfer," presumably implying that those individuals, like Plaintiff, also refused to relocate. (Defendants' Reply to Plaintiff's Brief in Opposition to the Motion for Reconsideration, Docket No. 125, "Defs.' Reply," at 18.)  That is not, however, the test applicable to the ADA.  To establish a *prima facie* case of disparate treatment under the ADA, a plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination. <u>Shaner v. Synthes USA</u>, 204 F.3d 494, 500 (3d Cir. 2000) (internal citations omitted.)  This is a somewhat different test from that used under Title VII and other anti-discrimination statutes where the plaintiff establishes a *prima facie* case by showing that: (1) he was a member of the protected class, (2) he was qualified for the position he held or sought, and (3) nonmembers of the

protected class were treated more favorably.  Goosby v. Johnson &
Johnson Medical, Inc., 228 F.3d 313, 318-9 (3d Cir. 2000).

Termination is without a question a recognized adverse
employment decision.  The Court of Appeals has recently held that
in the context of the ADA, "adverse employment decisions . . .
include refusing to make reasonable accommodations for a
plaintiff's disabilities."  Williams, 380 F.3d at 761.
"Reasonable accommodation" in turn includes the employer's
reasonable efforts to participate in the interactive process.
Id.  Thus, under the ADA, Plaintiff's three causes of action may
be considered disparate treatment without comparison to the
treatment given to other, non-disabled employees.

The Court will not attempt to construe what Plaintiff's
counsel was thinking when he "disavowed" the disparate treatment
claims at the March 12, 2004 hearing, but will allow Plaintiff's
ADA claims to be considered in their own right whether they are
characterized as disparate treatment or simply as disability
discrimination.

C.   Summary Judgment Issues

We turn, at long last, to the explicit issues on which
the parties seek summary judgment and conclude that each of them
involves at least one question of fact for the jury, therefore
making summary judgment inappropriate.

1.   *Failure to Participate in the Interactive*

34

*Process:* Each party claims that the other failed to participate in the ADA interactive process in good faith.  A plaintiff alleging that his employer did not participate in the interactive process must show that (1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist the plaintiff in identifying accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  Taylor, 184 F.3d at 319-320, *citing* Mengine, 114 F.3d at 420.  "Because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations."  Taylor, 184 F.3d at 317-318.  Contrary to Plaintiff's inferences throughout his pleadings that the duty of acting in good faith falls only on the employer, Mengine makes it clear that "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith."  Id. 114 F.3d at 420.[16]

---

[16]  The case on which Plaintiff relies when addressing this issue does not diverge from this conclusion.  *See* Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114-15 (9th Cir. 2000), noting that "the interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees.  The *shared goal* is to identify an accommodation that allows the employee to perform the job effectively.  *Both sides* must communicate directly, exchange essential information and *neither side* can delay or obstruct the process."  (Emphasis added.)

Where there is a genuine dispute as to whether an employer –
or employee – engaged in the process in good faith, granting
summary judgment is inappropriate.  <u>Taylor</u>, 184 F.3d at 319.  The
Court finds little purpose in summarizing the extensive lists of
actions each party claims the other did or did not take that
negatively affected the interactive process between March 25,
1999, and May 4, 2000.  (*See* Defs.' Sum. Judg. Brief at 22-30;
Defs.' Reply at 5-12; Defs.' Recon. Brief at 9-13; and Plf.'s
Opp. to Mot. Recon. at 5-10.)  We follow the example of Judge
DuBois in <u>Swierkowski v. CONRAIL</u>, 168 F. Supp.2d 389, 398 (E.D.
Pa. 2001) who denied summary judgment in a similar case, stating,
"Suffice it to say, that, considering all of the evidence on this
issue, the parties have raised genuine issues of material fact."

2.   *Failure to Accommodate:*  We also decline to grant
summary judgment to either party on Count I of the Complaint,
i.e., that Defendants failed to accommodate Mr. Whelan's
disability.  Although on one hand, the employer has a duty to
respond once the employee has sought an accommodation, the
employee has an equal duty to show that a reasonable
accommodation exists or could be devised.  As the Court pointed
out in <u>Mengine</u>, "where a plaintiff cannot demonstrate 'reasonable
accommodation,' the employer's lack of investigation into
reasonable accommodation is unimportant."  <u>Mengine</u>, 114 F.3d at
430, *quoting* <u>Willis v. Conopco, Inc.</u>, 108 F.3d 282, 285 (11th

36

Cir. 1997).

Mr. Whelan proposed a single accommodation:  that he be allowed to continue working from his home in Pittsburgh.  He claims this accommodation was reasonable because it had been working successfully for more than four years and was neither clearly ineffective nor outlandishly costly.  (Plf.'s Opp. to Sum. Judg. at 3-4.)  However, as Defendants argue, he fails to take into account that during that period, the TMP facilities were spread throughout Ontario, Connecticut, and Alabama.  The 1998 consolidation closed those facilities and moved all non-sales TMP employees to Grant.  What may have been a reasonable accommodation when the division was dispersed over a great geographic area may not have been reasonable when everyone except Mr. Whelan was concentrated in a single location.  (Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, Docket No. 44, at 2-9.)

"In determining whether an accommodation is reasonable, the employer must consider the following: (1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." Norman v. Univ. of Pittsburgh, CA No. 00-1655, 2002 U.S. Dist. LEXIS 27694, *43-*44 (W.D. Pa. Sept. 17, 2002), *citing*

37

29 C.F.R. § 1630.9(a).  An employer is not obligated to provide
an employee with the accommodation he requests or prefers.
Hinnershitz v. Ortep of Pennsylvania, CA 97-7148, 1998 U.S. Dist.
LEXIS 20264, * 14 (E.D. Pa. Dec. 22, 1998), *citing* Aka v.
Washington Hospital Center, 156 F.3d 1284, 1305 (D.C. Cir. 1998).

The Circuits are divided on the question of whether working
at home is a reasonable accommodation.  *Compare* Vande Zande v.
Wisconsin Dep't of Admin., 44 F.3d 538, 544-45 (7th Cir. 1995)
(barring "extraordinary circumstances," an employer is not
required to allow disabled employees to work at home without
supervision); Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209,
213 (4th Cir. 1994)(except in the unusual case where an employee
can effectively perform all work-related duties at home, an
employee who does not come to work cannot perform any of his job
functions, essential or otherwise); and Kvorjak v. Maine, 259
F.3d 48, 54-58 (1st Cir. 2001) (where the essential functions of
a particular job could not be performed effectively from the
employee's home, summary judgment was affirmed), *with* Humphrey v.
Memorial Hosps. Ass'n, 239 F.3d 1128, 1138, n.16 (9th Cir. 2001)
("working at home is a reasonable accommodation when the
essential functions of the position can be performed at home and
a work-at-home arrangement would not cause undue hardship for the
employer"); Carr v. Reno, 23 F.3d 525, 530 (D.C.Cir. 1994) ("in
appropriate cases," an agency is required to consider a request

to work at home as a potential form of accommodation).

While the Third Circuit has not spoken on the specific issue
of whether working at home is a reasonable accommodation, its
overarching position is that "the question of whether a proposed
accommodation is reasonable is a question of fact." Williams,
380 F.3d at 771, *citing* Buskirk v. Apollo Metals, 307 F.3d 160,
170 (3d Cir. 2002), and Skerski v. Time Warner Cable, 257 F.3d
273, 286 (3d Cir. 2001).  However, at least one district court
has followed Vande Zande, commenting that "the majority view is
that at-home accommodation is not required by the ADA." Dicino
v. Aetna U.S. Healthcare, CA No. 01-3206 (JBS), 2003 U.S. Dist.
LEXIS 26487, *51 (D. N.J. June 23, 2003).  Similarly, in Stanley
v. Lester M. Prange, Inc., 25 F. Supp.2d 581, 584 (E.D. Pa.
1998), the court concluded that while "it would take an
extraordinary case for the employee to be able to create a
triable issue of the employer's failure to allow the employee to
work at home," under the facts presented at summary judgment, it
could not say, as matter of law, that the request would be an
unreasonable accommodation.

Given the facts of this case, the Court is similarly unable
to say that Mr. Whelan's requested accommodation was or was not
reasonable.  Summary judgment is therefore denied on the failure
to accommodate claim.

3.  *Termination Due to Disability:*  Plaintiff frames

this issue as a claim "that he was unlawfully fired when the Defendants required him to transfer to Alabama, proposed no accommodations with the transfer, and then fired him for not accepting the transfer."  (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 35, at 5-6.)  He further argues that the Defendants "still don't understand the point: the Plaintiff could not (1) confirm whether he could or could not accept the transfer (2) nor ascertain whether he could perform the essential job functions of the position in Alabama unless and until the Defendants proposed accommodations with the transfer for his consideration."  (Plf.'s Opp. to Sum. Judg. at 1-2.)

Defendants, on the other hand, assert that during the period March 25, 1999, through April 14, 2000, Mr. Whelan never once indicated that he was willing to transfer to Alabama and never asked for any accommodation other than being allowed to remain in Pittsburgh.  (Defs.' Reply at 14-16.) Moreover, they argue, the proposed accommodation was nothing more than an attempt to preserve his previous working conditions, the transfer to Alabama was not an adverse employment decision, the decision to transfer him was not made because of his disability, and Plaintiff cannot establish that the ultimate reason given for his termination – his refusal to transfer to Alabama – is pretextual. (Defs.' Sum. Judg. Brief at 10-12, 31-32, and 38-39.)

ADA discrimination claims are analyzed pursuant to the

familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507 (1993).  Shaner, 204 F.3d at 501.  This three-step process first requires the plaintiff to establish by the preponderance of the evidence a *prima facie* case of discrimination.  As noted above, one element of a *prima facie* case of discrimination under the ADA is that the employee suffered an adverse employment decision as a result of his disability.  Shaner, id. at 500; Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998).

The genuine issue of material fact here that precludes granting summary judgment in favor of either party is whether Mr. Whelan's employment was terminated "as a result of" discrimination.  The ultimate answer to that question will depend on the jury's factual findings regarding the claims that Defendants failed to participate in the interactive process in good faith or failed to grant him a reasonable accommodation.  For example, should the jury find that Defendants demonstrated lack of good faith by failing to seriously consider Mr. Whelan's request that he be allowed to continue to work in Pittsburgh, it could logically also find that TMP refused to agree to this accommodation simply to get rid of a disabled employee.  Consequently, terminating his employment was the result of its

discriminatory action of failing to participate in the interactive process.  On the other hand, if the jury concludes that Mr. Whelan's proposed accommodation was unreasonable and/or an undue hardship for his employer, it could logically find that the decision to terminate him was based only on his refusal to transfer and thus not discriminatory if other employees who declined to relocate were also terminated.

Summary judgment is therefore denied as to Count III of the Complaint.

An appropriate Order follows.